GARY Y. LEUNG, *L.R. 83-2.4.1 leave to practice granted*
Email: leungg@sec.gov
PETER F. DEL GRECO (Cal. Bar No. 164925)
Email: delgrecop@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **CV14 07249-SJO(FFMx)** |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| NATIONWIDE AUTOMATED SYSTEMS, INC., JOEL GILLIS, and EDWARD WISHNER, | |
| Defendants, | |
| and | |
| OASIS STUDIO RENTALS, LLC, OASIS STUDIO RENTALS #2, LLC, and OASIS STUDIO RENTALS #3, LLC, | |
| Relief Defendants. | |

COMPLAINT                                                    1

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3.     This matter concerns a large ongoing Ponzi scheme. Defendants' scheme was to sell—in an unregistered securities offering—investment opportunities in automated teller machines ("ATMs") through purported "sale and leaseback" transactions.

4.     Since 2013 alone, Defendants raised at least $123 million in investor funds through its ATM sale and leaseback transactions with investors. Defendant Nationwide Automated Systems, Inc. ("NASI") told investors that it is in the business of placing, operating and maintaining ATMs, and that investors could purchase ATMs from NASI, and then lease them back to NASI in return for "rent" of 50 cents per ATM transaction, with a guaranteed investment return of at least 20% per year.

5.     But none of that was true. Legitimate ATM transaction revenue represented only a tiny fraction—less than 2%—of NASI's actual revenue. The vast majority of NASI's revenue was comprised of new investor funds. To an overwhelming degree, therefore, investor funds were not being used to acquire, place, operate, and maintain the thousands of ATMs that NASI said it had sold to them, but were instead being used to pay guaranteed returns NASI already owed to earlier

investors.  Defendants also did not actually own many of the ATMs they had ostensibly bought and allegedly sold to investors.  In fact, Defendants required investors to contractually promise that they would never contact the locations where their ATMs were supposedly located, all to ensure that no one could discover Defendants' fraud.

6.      Defendant Gillis is involved in all aspects of the fraud.  He is the president of NASI, he personally executed thousands of sale and leaseback agreements with investors on NASI's behalf, he is the signatory on the bank accounts from which NASI made Ponzi-like investor payments, and he was directly involved in the marketing of NASI's ATM investment opportunities to investors.

7.      Defendant Wishner is also a key actor in Defendants' fraudulent scheme.  He is the treasurer, vice president, and secretary of NASI, he was responsible for preparing NASI's tax returns, and he is a signatory on the bank accounts from which NASI made Ponzi-like investor payments.  Wishner is also the registered agent of and is affiliated with Relief Defendants Oasis Studio Rentals, LLC, Oasis Studio Rentals #2, LLC and Oasis Studio Rentals #3, LLC.

8.      As a result of the conduct alleged herein, Defendants have violated the antifraud provisions of the Securities Act and the Exchange Act, and Defendants NASI and Gillis have violated the registration provisions of Section 5 of the Securities Act.  Defendant Gillis is liable for these violations directly, and as a control person under Section 20(a) of the Exchange Act.

9.      The SEC brings this emergency action and seeks a temporary restraining order and preliminary injunction, among other relief, to halt Defendants' unlawful conduct and preserve the status quo.  The SEC also seeks entry of permanent injunctions against Defendants; disgorgement of ill-gotten gains and prejudgment interest thereon from Defendants and Relief Defendants; and civil penalties from Defendants.

## THE DEFENDANTS

10.     Nationwide Automated Systems, Inc. is a California corporation headquartered in Calabasas, California.  NASI is not registered with the SEC, and has not registered any offering or class of its securities with the SEC.

11.     Joel Barry Gillis is a resident of Woodland Hills, California.  Gillis is the president of Defendant NASI and a signatory on its bank accounts.  According to a press release issued by NASI, Gillis "runs" NASI.  He was formerly a registered investment representative, but he has not been registered since 1986.

12.     Edward Wishner is a resident of Woodland Hills, California.  Wishner is the treasurer, vice president, and secretary of Defendant NASI and a signatory on its bank accounts.  Wishner prepared NASI's tax returns.  Wishner is affiliated with Relief Defendants Oasis Studio Rentals, LLC, Oasis Studio Rentals #2, LLC and Oasis Studio Rentals #3, LLC (collectively, "Oasis Studio Rentals").

## RELIEF DEFENDANTS

13.     Oasis Studio Rentals, LLC is a California limited liability company headquartered in Houston, Texas which was formed in 2008.  Wishner is its registered agent.

14.     Oasis Studio Rentals #2, LLC is a California limited liability company headquartered in Woodland Hills, California which was formed in 2012.  Wishner is its registered agent.

15.     Oasis Studio Rentals #3, LLC is a California limited liability company headquartered at the same Woodland Hills address as Oasis Studio Rentals #2, and was also formed in 2012.  Wishner is its registered agent and one of its principals.

## FACTUAL ALLEGATIONS

A.     **Background on NASI**

16.     NASI was incorporated in 1996 and is controlled by Gillis.  To the public, NASI describes itself as "an ATM machine provider" which "works with high-traffic retail locations, hotels, casinos, convenience stores and movie theatres

COMPLAINT                                        4

1  located throughout the United States."  NASI claims that it "has been consistently

2  recognized for its exceptional customer service, sturdy machines and aggressive

3  revenue-sharing model."  NASI touts the fact that it operates "over 80 branches" with

4  "1,000 certified technicians on standby," and further claims that NASI services more

5  than $1 billion in ATM transactions per month.  Stated succinctly, NASI tells

6  investors that it is in the business of placing, operating and maintaining automated

7  teller machines.

8  **B.**     **The Unregistered NASI Offering**

9         **1.**     **Defendants' solicitation of investors**

10       17.    Since at least 1999 and continuing to the present, Defendants NASI and

11  Gillis have offered securities—in the form of ATM sale and leaseback agreements—

12  to the public.  From just January 2013 to today, Defendants have raised

13  approximately $123 million in investor money through the NASI ATM sale and

14  leaseback offering.[1]

15       18.    Defendants NASI and Gillis, directly and indirectly, solicited investors

16  through various salespeople, including Gillis himself, electronic mail, and by word-

17  of-mouth.  Defendants NASI and Gillis offered and sold NASI's ATM sale and

18  leaseback agreements to investors across the United States.

19         **2.**     **The terms of the NASI offering**

20       19.    Defendants sold investors ATMs through a standard package of

21  agreements, comprised of:  (i) an ATM Equipment Purchase Agreement ("Purchase

22  Agreement"); (ii) an ATM Equipment Lease Agreement ("Lease Agreement"); and

23  (iii) an Addendum To Owner Lease Agreement ("Addendum").  The three documents

24  were executed at or around the same time by investors, with Gillis signing on behalf

25

26  _____

27  [1] The NASI bank records with transaction-level detail that the SEC obtained during
its pre-filing investigation are limited to this 20-month time period; NASI, however,

28  has been engaged in the offer and sale of ATM sale and leaseback agreements since
at least 1999.

COMPLAINT                                                    5

1   of NASI.

2       20.    Under the terms of the Purchase Agreement, investors paid a flat

3   amount—typically $12,000, but in some cases $19,800 per ATM—to buy one or

4   more ATMs, all of which were identified in an exhibit to the contract by both "serial

5   number" and the name of the location to which the ATMs were to be delivered.  In

6   exchange for this payment, NASI, as "Seller", agreed to deliver the investor-

7   purchased ATMs to the location indicated by the agreement within 60 days.  Last,

8   NASI warranted that "the ATM(s) purchased by BUYER shall, at the time of

9   delivery, be free and clear of all liens, claims, debts, encumbrances, security interests,

10  or other charges."

11      21.    Under the terms of the Lease Agreement, investors then leased their

12  ATMs back to NASI for an initial 10-year term.  The lease provides that "NASI, at its

13  sole cost and expense, shall operate and maintain the ATMs and provide all services

14  relating thereto," including but not limited to "processing and accounting for all ATM

15  transactions, obtaining, the delivering and loading of cash for the ATMs, and

16  repairing, maintaining and servicing the ATMs."  Moreover, the lease states that

17  NASI, "at its sole cost and expense," shall "maintain insurance coverage on the

18  ATMs in an amount not less than the full replacement value of the ATMs," as well as

19  "liability insurance (both public liability and property damage) covering the operation

20  of the ATMs."

21      22.    The Lease Agreement further provides that "NASI shall pay to [the

22  investor] as rent an amount equal to $0.50 for each 'approved transaction' …

23  produced by the ATMs for each calendar month during the term of this Agreement."

24      23.    Following the initial 10-year lease term, the Lease Agreement

25  automatically renewed for additional 3-year periods thereafter, unless investors

26  provided written notice at least 60 days in advance of expiration of their intent to

27  terminate.  If terminated, NASI would either deliver an investor's ATMs to a

28  designated place, or alternatively, return the full amount of their initial investment,

1    *i.e.*, the purchase payment provided for in the Purchase Agreement.

2       24.     The Lease Agreement also includes the following "non-interference"

3    clause:

> 11.     Non-Interference.  During the term of this Agreement,
> including any extensions thereof, and provided that NASI is not in
> default under the terms hereof, Lessor agrees not to interfere with
> the operation of the ATMs by NASI in any manner including, but
> not limited to, contacting the locations where the ATMs is/are
> installed and/or any service providers under contract with NASI
> relating to the operation of such ATMs.

11       25.     Last, the Addendum modified the rent obligation set forth in the Lease

12    Agreement by guaranteeing a minimum investment return of 20% per year.  In the

13    Addendum, NASI promised that "[i]f at anytime [*sic*] the owner's ATM machine

14    fails to make enough transactions [t]o pay the owner a monthly check equivalent to

15    twenty (20%) percent [a]nnual return on the owner's investment … [NASI]

16    guarantees to pay owner the difference between what the Owner has received and [a

17    20% annual return.]"  The Addendum also modified the ten-year lease term provided

18    for in the Lease Agreement by granting investors the right, after only two years, to

19    sell their ATMs back to NASI at their original sales price at any time.

20       26.     When marketing NASI's ATM sale and leaseback agreements,

21    Defendants NASI and Gillis touted NASI's purported 19-year track record of

22    profitable returns for investors.  They also claimed that the locations acquired by

23    NASI were strong performers, and that many ATMs installed in those areas yielded

24    transaction revenue in excess of the 20% already guaranteed by NASI.  Defendants

25    NASI and Gillis encouraged investors to invest in NASI's ATM sale and leaseback

26    agreements by periodically representing that NASI had "secured" a new "round" of

27    convenience store locations at which ATMs would be installed, but that because these

28    opportunities were limited, interested investors should quickly invest while they were

1   still available.  Defendants NASI and Gillis urged, in addition, that investors should
2   roll their IRA savings into NASI's ATM sale and leaseback agreements because these
3   investments would outperform most traditional retirement investments.

4        27.    NASI's ATM sale and leaseback agreements are securities in the form of
5   investment contracts.  They represent an investment of money, in a common
6   enterprise, with the expectation of profits to be derived from the efforts of a third
7   party.  Investors provided money to NASI for investment purposes.  Because the
8   terms of the NASI Purchase Agreement, Lease Agreement and Addendum made
9   investors entirely dependent on NASI to operate and maintain their purported ATMs,
10  investors were investing in a common enterprise.  And for that same reason, along
11  with investors' contractual promise not to "interfere" with the operation of their
12  ATMs, NASI's efforts were essential to the failure or success of the common
13  enterprise.

14      **3.    The NASI offering is not registered**

15      28.    Defendants have not registered with the SEC any offering of any kind by
16  NASI.

17      29.    Defendants NASI and Gillis have offered and sold NASI's ATM sale
18  and leaseback agreements through interstate commerce to investors residing in
19  multiple states.

20  **C.    Defendants' Misrepresentations and Fraudulent Scheme**

21      30.    In its ATM sale and leaseback agreements and other written
22  communications, NASI made the following representations to investors regarding
23  their investment with NASI.  All of these statements were false and deceptive, and
24  made by Defendants in furtherance of a fraudulent scheme:

25          (a)    Investors were buying from NASI an actual ATM, identified by
26  serial number, "free and clear of all liens, claims, debts, encumbrances, security
27  interests, or other charges."

28          (b)    The ATMs bought by investors would then be installed by NASI

COMPLAINT                                    8

1   at a designated place—typically, hotels, convenience stores, and gas stations located

2   across the United States.

3         (c)    Following the sales transaction, investors' ATMs would remain, at

4   all times, their "sole and exclusive personal property."

5         (d)    During the lease term, NASI would "operate and maintain the

6   ATMs … includ[ing] … processing and accounting for all ATM transactions,

7   obtaining, the [sic] delivering and loading of cash for the ATMs, and repairing,

8   maintaining and servicing the ATMs," "maintain insurance coverage on the ATMs,"

9   and "pay, prior to delinquency, all personal property taxes assessed against and levied

10   upon the ATMs."

11         (e)    During the lease term, NASI would pay to investors 50 cents per

12   transaction occurring in their ATMs, with NASI agreeing that in the event of a

13   shortfall, it would guarantee a 20% annual return on investment; NASI said that it

14   was able to make this guarantee because with ATM transaction fees typically being in

15   the range of $2.50-$3.00—well above the 50 cents per transaction in rent owed by

16   NASI under the lease—NASI could guarantee a 20% return by shifting part of its

17   share of the ATM transaction revenue back to investors.

18         (f)    Each month, NASI would send investors monthly transaction

19   reports that purportedly detailed the performance of the ATMs that they owned; these

20   transaction figures would then form the basis for NASI's monthly payments to

21   investors.

22       31.    NASI is also a Ponzi scheme.  NASI does not own or operate the tens of

23   thousands of ATMs it claims to have sold and leased back from its investors.  The

24   legitimate ATM transaction revenue on ATMs that NASI, in fact, operates is only a

25   miniscule part of its total revenue.  By a wide margin, NASI's incoming revenue is

26   comprised of new investor funds.  And so each month, the payments NASI made to

27   investors under their NASI Lease Agreements were not paid from real ATM

28   transaction revenue, but were instead funded by money received from new investors

1    in Defendants' Ponzi scheme.

2    **1.    Misrepresentations about NASI's operation and ownership of ATMs**

3         **sold to and leased back from investors**

4         32.    According to NASI's records, NASI had sold and was leasing back more

5    than 31,000 ATMs to investors as of June 2014.  These ATMs were purportedly

6    located in hotels, gas stations and convenience stores across the United States, and in

7    particular, NASI claimed that many of these ATMs were located in less densely-

8    populated areas—towns such as Ottumwa, Iowa; Bicknell, Indiana; Viola, Illinois;

9    Plattsmount, Nebraska; Higgensville, Missouri; and Medicine Lodge, Kansas, to

10   name only a few.

11        33.    Because of the "Non-Interference" provision in their NASI Lease

12   Agreements, investors were contractually barred from contacting these locations to

13   learn anything at all about NASI's operation of their putative ATM investments.

14        34.    Each month, NASI sent investors monthly transaction reports for the

15   ATMs that they "owned."  When one interested investor asked NASI, "How can I

16   audit the ATM's monthly revenue?," a NASI sales representative tersely responded,

17   "Your statement with each check is your audit."  In fact, in their monthly reports to

18   investors, Defendants fabricated false transaction figures for, in many cases, either

19   non-existent ATMs or ATMs that neither NASI nor its investors actually owned.

20        35.    NASI's claim of 31,000 ATMs under operation is not true.  To operate

21   its ATMs, NASI subcontracted with two ATM service providers.  In exchange for

22   certain fees, these third-party ATM servicers provided ATM processing, settlement,

23   clearing, installation, and maintenance services to NASI for all of the ATMs owned

24   or allegedly leased by NASI.  Each month, the ATM servicers issued settlement

25   reports to NASI, detailing the revenue generated by NASI's ATMs, less fees owed to

26   the ATM servicers, with the balance to be paid to NASI by monthly check.  These

27   settlement reports listed each NASI ATM by location and by Terminal ID.

28        36.    NASI's records of its ATMs under operation list more than 31,000

COMPLAINT                                    10

purported ATM holdings.  The settlement reports from NASI's third-party ATM servicers, however, identify only about 235 ATMs serviced for NASI.  In short, Defendants have "sold" and "leased back" tens of thousands of ATMs to NASI investors that they never owned, that they never operated, and that may have never existed.

37.     As just one example, NASI's internal records claim ownership or operation of about 673 ATMs located at various "Casey's Convenience Mart" businesses in Nebraska, Iowa, Minnesota, Kansas and Illinois.  These same Casey's Convenience Mart locations are listed in dozens of NASI investor agreements as the business locations at which NASI installed the ATMs that these investors had supposedly paid for.  Neither NASI nor its investors own any of the ATMs being operated in Casey's Convenience Mart stores across the Midwest United States.  Rather, each and every Casey's Convenience Mart ATM is in fact owned by a company called MobileMoney, Inc., a San Clemente-based company which has no affiliation with NASI.

38.     What's more, in many instances NASI sold the same sham Casey's Convenience Mart ATM to more than one investor.  For instance, in 2013, NASI sold an ATM at a single Casey's store in Norfolk, Nebraska, to five different NASI investors, with two of those sales occurring only 16 days apart.  Defendants not only sold investors ATMs that NASI had never owned, but ATMs which Defendants had already fraudulently "sold" to other investors.

**2.     The Ponzi scheme**

39.     Defendants did not pay investors transaction revenue from the operation of the ATMs that NASI claimed to have sold investors.  Defendants instead made Ponzi-like payments funded by cash from new investors.

40.     In April, May and June 2014, a total of about $23,783,827.29 was deposited to NASI's bank accounts.  Of that amount, only approximately $390,805.46—or 1.64%—represented legitimate ATM transaction revenue from

COMPLAINT                                    11

1   NASI's third-party ATM servicers.  By contrast, about $18,420,608.25 in investor

2   funds were deposited to NASI's bank accounts.  But NASI paid to investors at least

3   $23,492,097 in amounts owed under NASI's ATM sale and leaseback agreements.

4   Accordingly, NASI's April, May and June investor payments were not funded by

5   legitimate ATM transaction revenue, but instead by cash raised from new investors.

6   **3.     The misappropriation and misuse of investor proceeds**

7   41.     In addition to making Ponzi payments to investors as alleged above,

8   Defendants wrongly transferred investor proceeds to Relief Defendants Oasis Studio

9   Rentals, three entities affiliated with Wishner.

10   42.     NASI's April 2013 balance sheet reflects a $1,477,192 receivable due

11   from Oasis Studio Rentals.  These entities were formed in 2008 and 2012, and

12   Wishner serves as the registered agent for each entity.  Within eight months, NASI's

13   balance sheet indicated that this $1.477 million receivable from Oasis Studio Rentals

14   had been reduced to only $75,000.  NASI's bank records, however, reflect only

15   $28,250 in payments made by Oasis Studio Rentals to NASI during that period of

16   time, in the form of two checks signed by Wishner.  During this time period, the

17   source of virtually all of NASI's incoming cash was new investor funds.

18   43.     Accordingly, Defendants misappropriated and misused investor proceeds

19   by loaning and later forgiving or writing off large amounts of money to unrelated

20   entities affiliated with Wishner.

21   **D.     The Ongoing Nature of the Fraud**

22   44.     In August 2014, NASI bounced approximately $3 million in checks to

23   NASI investors.  By the end of the month, NASI had drained its bank account,

24   drawing it down to a balance of less than $200,000.

25   45.     Following hundreds of calls from concerned investors, NASI told

26   investors in an August 28, 2014 letter from Defendant Gillis that: "We cannot

27   control the U.S. mail, and there will always be a small percentage of checks that for

28   some reason or another never make it to their intended location."

COMPLAINT                                    12

46.     NASI also stated in Gillis's letter: "In 19 years we have never, never been late.  We have never had to deal with such a challenge of this type or magnitude.  We have always posted and mailed checks on the 1st of each month or the Monday following, if the 1st fell on a weekend or holiday."

47.     Gillis's August 28th letter further stated: "I will not go into every detail, but we came to the uncomfortable realization that the current infrastructure of Nationwide cannot support over 4000 phone calls that were fielded in the first 2-1/2 weeks of August.  Some of those calls were the same people calling two or three times."

48.     The August 28th letter further stated: "The September 1st check will be going out late as well due to the inordinate amount of time spent on complaints, cleaning up the general accounting and system upgrades.  We hope to be back on track by October 1st."

49.     Finally, Gillis's August 28th letter stated: "Please do not call us with check mailing inquiries for September.  We estimate that they will go out anywhere from the 8th to the 10th.  If checks are not received within the standard 10 day period please e-mail us at: accounting@nationwideautomatedsystems.com as we do not wish to spend the next few weeks on the telephone and revisit the same unpleasant experience."

50.     Defendants NASI and Gillis separately attempted to lull investors by also telling them that their bounced checks had been caused by a mere "glitch" in connection with NASI's decision to contract with a new outside firm to manage investor payments.  NASI claimed this "system conversion" had not gone "smoothly."

51.     On August 20, Defendants opened a new NASI account at a different bank.  From that new account, NASI continued raising investor money and making Ponzi-like payments to existing investors.

52.     From August 20 to September 8, 2014, a total of about $3,871,430 was deposited to NASI's new bank account.  Of that amount, only $52,463—or 1.36%—represented legitimate ATM transaction revenue from NASI's third-party ATM servicers.  By contrast, $3.36 million in deposits during that period came from new NASI investors.  But in that timeframe, NASI paid to existing investors at least $2,044,050 in amounts owed under NASI's ATM sale and leaseback agreements.  Accordingly, NASI's August and September investor payments from its new bank account were not funded by legitimate ATM transaction revenue, but instead by cash raised from new investors.

**E.     Defendants' Roles in the Fraud**

53.     At all relevant times, Defendant Gillis controlled NASI.  Gillis formed and controls NASI.  He has been identified in NASI written communications and a press release as NASI's president, and the man responsible for "running" NASI's operations.

54.     Gillis is also a signatory to the Sales Agreements, Lease Agreements, and Addendums that NASI entered into with its investors.  He is also a signatory on NASI's bank accounts; significantly, Defendant Gillis signed thousands of the investor checks since 2013 which constitute Ponzi scheme payments.

55.     As a principal of NASI, Gillis's mental state is imputed to his company, Defendant NASI.

56.     Gillis made direct misrepresentations to investors regarding NASI's ATM sale and leaseback investment opportunities, including meeting in-person with investors to solicit their investment.

57.     Gillis knew, or was reckless in not knowing, that the false and misleading representations and omissions alleged herein were being made to investors about NASI's ATM sale and leaseback business.  Gillis knew, or was reckless in not knowing, that NASI does not own or operate the tens of thousands of ATMs it claims to have sold and leased back from its investors, that NASI's real

COMPLAINT                                    14

1 ATM transaction revenue was only a minute part of the cash coming into the
2 company, that instead, NASI's revenue was almost all comprised of new investor
3 funds, and that NASI's payments to investors were Ponzi payments made with other
4 investors' money.

5      58.    On information and belief, in one case, a former NASI investor called
6 the rural California hotel that Defendants said her ATM was located at.  She learned
7 that the hotel did not have an ATM on the premises and never had.  She then
8 contacted Gillis, and left a message to the effect of, "I know what you're doing.  And
9 I want my money back."  The very next day, Gillis provided that investor with a
10 cashier's check for the full amount of her investment.  He asked her no questions.

11      59.    At all relevant times, Defendant Wishner was NASI's vice president,
12 treasurer and secretary.  Wishner prepared NASI's tax returns.  He is a signatory on
13 NASI's bank accounts and typically signed the bulk of the checks written out of
14 NASI's general account.  He also signed dozens of investor checks written since
15 August 2014 which constitute Ponzi scheme payments.

16      60.    As a signatory to all of NASI's bank accounts and the NASI executive
17 responsible for preparing its tax returns, Wishner knew, or was reckless in not
18 knowing, that NASI's real ATM transaction revenue was only a minute part of the
19 cash coming into the company, that instead, NASI's revenue was almost all
20 comprised of new investor funds, and that NASI's payments to investors were Ponzi
21 payments made with other investors' money.

22      61.    Wishner also signed, on NASI's behalf, one of NASI's ATM
23 management agreements with its third-party ATM service providers.  These
24 management agreements provided the only source of NASI's legitimate ATM
25 transaction revenue.

26      62.    As a principal of NASI, Wishner's mental state is imputed to his
27 company.  His mental state is also imputed to his affiliated entities, Relief Defendants
28 Oasis Studio Rentals.

# FIRST CLAIM FOR RELIEF

## Fraud in Connection With the Sale of Securities

## Violations of Section 10(b) of the Exchange Act

## and Rule 10b-5(b) Thereunder

**(against Defendants NASI and Gillis as primary violators, and, alternatively, against Gillis as a control person under Section 20(a) of the Exchange Act)**

63.     The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

64.     Defendants NASI and Gillis, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading

65.     By engaging in the conduct described above, Defendants NASI and Gillis, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

66.     Defendant Gillis was a control person of Defendant NASI because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendant Gillis is liable to the SEC to the same extent as Defendant NASI for its violations of Section 10(b) and Rule 10b-5(b) thereunder.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer and Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendants NASI and Gillis)

67.     The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

68.     Defendants NASI and Gillis, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, with scienter, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     By engaging in the conduct described above, Defendants NASI and Gillis, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## THIRD CLAIM FOR RELIEF

### Fraud in Connection With the Sale of Securities

### Violations of Section 10(b) of the Exchange Act

### and Rules 10b-5(a) and (c) Thereunder

### (against all Defendants as primary violators, and, alternatively, against Gillis as

### a control person under Section 20(a) of the Exchange Act)

70.     The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

71.     Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

COMPLAINT                              17

a.      employed devices, schemes, or artifices to defraud; or

b.      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

72.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

73.     Defendant Gillis was a control person of Defendant NASI because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendant Gillis is liable to the SEC to the same extent as Defendant NASI for its violations of Section 10(b) and Rule 10b-5(a) and (c) thereunder.

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer and Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act\

### (against all Defendants)

74.     The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

75.     Defendants, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

a.      with scienter, employed devices, schemes, or artifices to defraud; or

b.      engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

76.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of

COMPLAINT                                    18

the Securities Act, 15 U.S.C. § 77q(a)(1) and (3).

### FIFTH CLAIM FOR RELIEF

### Sale of Unregistered Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants NASI and Gillis)

77.    The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

78.    Defendants NASI and Gillis, by engaging in the conduct described above, directly or indirectly, made use of means or instruments or transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

79.    No registration statement has been filed with the SEC or has been in effect with respect to any of the offerings alleged herein, and no exemption from registration applies.

80.    By engaging in the conduct described above, Defendants NASI and Gillis have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), temporarily, preliminarily and permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or

COMPLAINT                                          19

otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

### III.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction against all Defendants, freezing the assets of Defendants Gillis, Wishner, NASI, and their respective affiliates, and freezing the assets of Relief Defendants Oasis Studio Rentals, LLC, traceable to the fraud; prohibiting all Defendants from destroying documents; granting expedited discovery; requiring accountings from Defendants; and appointing a Receiver over NASI and its respective affiliates.

### IV.

Order Defendants and Relief Defendants to disgorge all ill-gotten gains they received, together with prejudgment interest thereon.

### V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

## VII.

2        Grant such other and further relief as this Court may determine to be just and

3   necessary.

4

5   Dated:  September 17, 2014

6

7                                                    Gary Y. Leung
                                                     Peter F. Del Greco
8                                                    Attorneys for Plaintiff
                                                     Securities and Exchange Commission
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                 21

ORIGINAL

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | NATIONWIDE AUTOMATED SYSTEMS, INC., JOEL GILLIS, and EDWARD WISHNER, and Relief Defendants OASIS STUDIO RENTALS, LLC, OASIS STUDIO RENTALS #2, LLC AND OASIS STUDIO RENTALS #3, LLC |

| (b) County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant   Los Angeles |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. | Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. |
|---|---|
| Gary Y. Leung, Peter F. Del Greco, U.S. Securities and Exchange Commission, 5670 Wilshire Blvd., 11th floor, Los Angeles, CA 90036 (323) 965-3998 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   **MONEY DEMANDED IN COMPLAINT:** $ Unspecified amoun

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a). This matter concerns an ongoing Ponzi scheme involving the sale and leaseback of ATMs.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | **TORTS** | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **PERSONAL PROPERTY** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | ☐ 370 Other Fraud | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 371 Truth in Lending | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 440 Other Civil Rights | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 441 Voting | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/ Accommodations | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:   Case Number:   CV14   07249

CV-71 (06/14)                    CIVIL COVER SHEET                    Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No<br><br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | [ ] Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>[X] NO. Continue to Question B.2. |
|---|---|---|
| [ ] Yes  [ ] No<br><br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>[X] NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>[ ] NO. Continue to Question C.2. |
|---|---|---|
| [ ] Yes  [X] No<br><br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>[ ] NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A.<br>Orange County | B.<br>Riverside or San Bernardino County | C.<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | [ ] | [ ] | [X] |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | [ ] | [ ] | [X] |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| [ ] Yes  [X] No | [ ] Yes  [X] No |
| If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br><br>Enter "Southern" in response to Question E, below, and continue from there.<br><br>If "no," go to question D2 to the right. ➡ | If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br><br>Enter "Eastern" in response to Question E, below.<br><br>If "no," your case will be assigned to the WESTERN DIVISION.<br><br>Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | Western |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | [ ] Yes  [X] No |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court**?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any cases previously filed **in this court**?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are related when they:

☐ A. Arise from the same or closely related transactions, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Check all boxes that apply. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____   DATE: September 17, 2014

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |